**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                        )
**PAMELA ANNE NUGENT, M.D.**             )
**3906 Huntington Street, NW**           )
**Washington, DC  20015,**               )
                                        )
                **Plaintiff,**           )
    **v.**                               )
                                        )
**UNUM LIFE INSURANCE COMPANY**          )        **Civil Action No. _____**
  **OF AMERICA**                         )
**2211 Congress Street**                 )
**Portland, ME  04122-0003,**            )
                                        )
**Resident Agent:**                      )
    **CT Corporation System**            )
    **1015 15ᵗʰ Street, NW, Suite 1000**  )
    **Washington, DC  20005**            )
                                        )
                **Defendant.**           )
_____)


**COMPLAINT FOR DECLARATORY AND OTHER RELIEF**


**NATURE OF THE ACTION**

1.      This is an action by an insured, Pamela A. Nugent, M.D. ("Dr. Nugent"), against

her disability insurance carrier, Unum Life Insurance Company of America ("Unum"), to compel

Unum to live up to its contractual obligation to provide disability benefits to Dr. Nugent under a

disability insurance policy that she purchased in 1990 and which remains in effect today ("the

Unum Policy").  Dr. Nugent seeks the following relief:  (1) payment of all past and future

disability benefits (plus interest) wrongfully denied her by Unum; (2) the return of premiums she

paid to Unum during the period of her total disability; (3) a declaration that she is entitled to

payment of future disability benefits under the Unum Policy; (4) payment of monetary damages

sufficient to compensate her for the emotional distress and mental anguish she has suffered and

continues to suffer as a result of Unum's reckless infliction of emotional distress in the handling of her disability claim; (5) punitive damages sufficient to deter Unum from engaging in such misconduct in the future; and (6) the attorneys fees and costs Dr. Nugent incurs in prosecuting this action.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1332, 2201, and 2202.  The matter in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between Dr. Nugent, who resides in the Washington, D.C., and Unum, which is incorporated and has its principle place of business in Maine.

3.      Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (c) because Unum is subject to personal jurisdiction in, and therefore is a resident of, the District of Columbia.  This Court has personal jurisdiction over Unum pursuant to D.C. Code § 13-423(a)(1) because Unum has transacted business in the District of Columbia and Dr. Nugent's claims arise out of the business transacted by Unum in the District of Columbia.  This Court also has personal jurisdiction over Unum pursuant to D.C. Code § 13-423(a)(4) because Unum regularly sells insurance in the District of Columbia and some of Dr. Nugent's claims arise out of Unum's acts or omissions which caused injury to Dr. Nugent in the District of Columbia.

## THE PARTIES

4.      Plaintiff Pamela A. Nugent is and has been a citizen of the District of Columbia at all times relevant to matters alleged in this Complaint.  Dr. Nugent is a physician trained in the subspecialty of neuroradiology.  After graduating with a Bachelors Degree in Psychology from Georgetown University in 1983, she attended medical school at the George Washington School of Medicine and Health Sciences, after which she entered a five-year residency in radiology.

She was offered the rare opportunity to work solely in neuroradiology during the senior year of her radiology residency.  She then accepted a two-year neuroradiology fellowship at the George Washington University Medical Center, after which she was elected a member of the American Society of Neuroradiology.  She was Assistant Professor of Radiology at the George Washington University Medical Center from January through October 1994.  She began practicing as a neuroradiologist in 1993 and continued to do so until she took maternity leave in 1996.  Dr. Nugent was involved in an automobile accident in November 1999 and has been unable to practice as a neuroradiologist since that time.

5.      Defendant Unum Life Insurance Company of America ("Unum") is a private insurance company with its principal place of business in Portland, Maine.  Unum is licensed to sell disability insurance and does sell such insurance throughout the United States, including in the District of Columbia.  Unum is a subsidiary of Unum Group, a publicly-traded corporation formerly known as UnumProvident Corporation.  Unum Group sells insurance through its subsidiaries, including Unum.  Based on knowledge and belief, Unum Group's present net worth is in excess of $8 billion.

## GENERAL ALLEGATIONS

The Unum Policy

6.      In 1990, Dr. Nugent purchased from Unum a "Disability Income Policy," Policy No. LAD 102847 ("the Unum Policy").  Her Unum Policy became effective on July 10, 1990 and remains in effect today.  The policy was paid for and delivered to Dr. Nugent in the District of Columbia.  A true and correct copy of the Unum Policy is attached hereto as **Exhibit A** and incorporated herein by reference.

7.     Disability policies like the Unum Policy are sometimes referred to as "Cadillac" policies because they provide many benefits to insureds beyond those provided by most other types of disability policies sold by Unum and other insurers.

8.     Unlike many other disability policies, for example, the Unum Policy defines "total disability" and "regular occupation" very broadly, as follows:

> "Total Disability" and "totally disabled" mean injury or sickness [that] restricts Insured's ability to perform the material and substantial duties of his regular occupation to an extent that prevents him from engaging in his regular occupation.

> "Regular Occupation" means …the Insured's occupation at the time the Elimination Period begins.  If the Insured engages primarily in a professionally recognized specialty at that time, his occupation is that specialty.

9.     Because Dr. Nugent is a professional qualified to practice in a particular subspecialty, she is considered "totally disabled" within the meaning of the Unum Policy if she is unable to perform any single material and substantial duty of that subspecialty.

10.     The "maximum benefit period" in the Unum Policy is the period of time over which Dr. Nugent is entitled to receive disability payments from Unum.  Two riders to the Unum Policy, labeled the "Lifetime Accident Benefit Rider" and the "Lifetime Sickness Benefit Rider" extend the benefit period available to Dr. Nugent to her entire lifetime, provided that either: (1) her total disability is due to an *injury* which occurs before the policy anniversary following her 65th birthday and has continued until the month for which the benefit is payable; or (2) her total disability is the result of *sickness* which began before the policy anniversary following her 60th birthday and has continued until the month for which the benefit is payable.

11.     The Unum Policy defines "Injury" to mean "bodily harm caused by an accident." The Unum Policy defines "Sickness" to mean "a mental or physical illness or condition which has been diagnosed or treated."

12.     The Unum Policy has a cost of living adjustment ("COLA") rider that provides that Dr. Nugent's maximum disability benefit will increase annually during the period of her disability until the policy anniversary after her 65th birthday.  The COLA is to be calculated by a formula specified in the rider, which is based on the change in the consumer price index (CPI) over each year of Dr. Nugent's disability.

13.     At the time it was purchased by Dr. Nugent, the Unum Policy contained an exclusion for "loss, impairment or disability due to, contributed to by, or resulting from….psychosis, psychoneurosis, anxiety, depression or any emotional or adjustment disorder." However, this exclusion was declared null and void, effective November 24, 1992, in a letter from Unum to Dr. Nugent dated January 4, 1993, a true and correct copy of which is attached to the Unum Policy (**Exhibit A**).

14.     Dr. Nugent has timely paid all premiums required under the Unum Policy. Moreover, Dr. Nugent has paid certain premiums that were not required under the Unum Policy given that she had been totally disabled for more than 90 days at the time of payment.  The Unum Policy provides that if a disability lasts for 90 days while the Policy is in effect, Unum waives the premium payment "as long as the Insured is unable to return to work full time in his regular occupation as a result of the injury or sickness which causes the disability."  Unum is required to refund on a *pro rata* basis any such premium paid after the applicable 90-day period.

Dr. Nugent's "Regular Occupation"

15.     In 1993 Dr. Nugent became a specialist in neuroradiology upon completion of a two-year fellowship in that subspecialty at the George Washington University Hospital.

16.     Dr. Nugent practiced her subspecialty until she took maternity leave in 1996. Prior to her leave of absence, Dr. Nugent was working as a neuroradiologist for 52 hours per week, and was earning $130,000 per year.  During her maternity leave, Dr. Nugent attended all

continuing medical education courses needed to reactive her medical licenses in Maryland, the District of Columbia and Virginia as soon as she was ready to resume her practice.

17.     At the time she was involved in an automobile accident in November 1999, Dr. Nugent was preparing to reactivate her state medical licenses, which had become inactive during her time off work.  She simply had to reactivate those licenses to return to work full-time as a neuroradiologist.

18.     Neuroradiology is a subspecialty of radiology which emphasizes the diagnosis and characterization of abnormalities of the central and peripheral nervous system, spine, head and neck.  The material and substantial duties of a neurologist include the following:

- Interpretation of MR and CT examinations of the nervous system
- Interventional procedures, including:
  - Lumbar puncture
  - Myelography
  - Angiography
  - Discography
  - Facet joint block
  - Biopsy of lesions
  - Sialography
  - Vertebral biopsy
  - Para vertebral biopsy
- Conferring with all referring physicians including neurosurgeons and orthopedic surgeons

19.     To perform these material and substantial duties of a neuroradiologist, Dr. Nugent must have at least the following abilities:  (1) the capacity to perform her duties under stress when confronted with emergency, critical, unusual or dangerous situations; (2) the ability to maintain working speed in performing her duties; (3) sustained attention in the performance of her duties; (4) the ability to engage in regular contact with other care providers in the performance of her duties; and (5) the capacity to make prompt, independent judgments.

Dr. Nugent's Accident and Her Attempt to Return to Work

20.     On November 12, 1999, Dr. Nugent was driving alone in Montgomery County, Maryland, when her automobile was struck from the side by another vehicle.

21.      Dr. Nugent felt extremely dazed immediately following the accident.  She could not recall how to work her cell phone and had difficulty attempting to exchange information with the person who was driving the car that struck her vehicle.

22.      Approximately one week after the accident, Dr. Nugent began experiencing severe headaches on a daily basis.  Her headaches were accompanied by nausea, vomiting, photophobia (extreme light sensitivity), and phonophobia (extreme sound sensitivity).  She had never suffered severe headaches before in her life.

23.     In late 1997—two years before the accident—Dr. Nugent began periodically seeing Judith A. Nowak, M.D., a psychiatrist practicing in Washington, D.C., for treatment for mild depression.  Dr. Nugent had sessions with Dr. Nowak immediately before and after her accident, and she has continued to see Dr. Nowak up to the present.  Accordingly, Dr. Nowak is in a unique position to evaluate the extent to which the accident affected Dr. Nugent's physical and mental well-being.

24.     Dr. Nowak saw Dr. Nugent on November 24, 1999—12 days after the accident. Dr. Nowak's notes from that session report that Dr. Nugent experienced severe headaches since the previous week, with a very bad migraine on the day of the visit, "with nausea, vomiting & photophobia."  Dr. Nowak further noted that Dr. Nugent "has never had any severe headaches with theses characteristics before last Wed. 11/17."

25.     Dr. Nowak concluded that Dr. Nugent's accident caused a sudden, dramatic and obvious change in her mental status.

26.     At the urging of Dr. Nowak on November 24, 1999, Dr. Nugent was examined on

that same day by Jody E. Green, M.D. at the Center for Neurology and Pain Management in

Bethesda, Maryland.  Based on that examination, Dr. Green reported that Dr. Nugent's

headaches "were never particularly severe until the patient was involved in a motor vehicle

accident on Friday, November 12, [1999]."  Dr. Green also reported that since the accident Dr.

Nugent had been suffering daily headaches that were "extremely severe" and were "accompanied

by nausea, vomiting, photophobia, and phonophobia… She has never had headaches like this

before."

27.     After a follow-up visit by Dr. Nugent on December 2, 1999, Dr. Green concluded

that Dr. Nugent's "symptoms of mental fogginess as well as headache are almost certainly due to

post concussion syndrome from her whiplash injury."

28.     On December 22, 1999, after another session with Dr. Nugent, Dr. Green reported

as follows:

> [Dr. Nugent's] headaches have been debilitating, and she has been having them
> daily.  They are throbbing and have produced photophobia.  In addition, she
> feels she is still not thinking clearly since her accident.

29.     On December 20, 1999—six weeks after the accident—Dr. Nugent visited David

B. Fishkin, D.C., a chiropractor.  Dr. Fishkin subsequently reported as follows:

> My initial impression from the history, observation of the patient's behavior,
> physical examination and past experience is that she has sustained an
> acceleration/deceleration injury to the head, neck, thoracic, lumbar spine and
> pelvis.
>
> This has resulted in injury to the joint, muscular, ligamentous, and central nervous
> systems.
>
> These injuries are the result of the rapid angular acceleration of the body from the
> crash.  She had little benefit from the harness and headrest due to the angle of the
> impact.

30.     On February 11, 2000, Dr. Nugent was examined by Linda Sapin, Ph.D., a neuropsychologist at the Neurology Center in Chevy Chase, Maryland.  Dr. Sapin's diagnosis was "post concussive syndrome" characterized by attention deficits in the areas of memory and concentration.  Dr. Sapin advised Dr. Nugent that "she will need to alter her plans to return to work at this time."  Dr. Sapin concluded as follows:

> Neuropsychological testing revealed relative weakness in concentration and attention, particularly with divided attention and there is still some weakness in verbal memory skills, perhaps secondary to the attentional difficulties as well. The diagnostic impression at this time is of a post-concussive syndrome characterized by persistent attentional problems which are impacting memory, reading concentration and sequential or multi-task activities.

31.     On March 22, 2000, Dr. Nugent was again evaluated by Dr. Jody Green.  Dr. Green reported on that evaluation as follows:

> Dr. Nugent had very bad headaches over the last 2-3 weeks.  This is beginning to make her feel demoralized.  The headaches are virtually daily.  Although she can still function with the headaches, she suffers from severe photophobia and it is difficult for her to maintain concentration.  She has stopped reading the newspaper and medical journals because reading causes a full-blown migraine.  She has decreased her socialization as it is difficult for her to concentrate.

32.     Dr. Nugent also continued to see her psychiatrist, Dr. Nowak, in 2000 and 2001. During this period Dr. Nowak prescribed a number of different medications in an effort to control Dr. Nugent's prolonged and incapacitating migraine headaches.

33.     In July 2001, at the recommendation of Dr. Nowak, Dr. Nugent was evaluated by neurologist Thomas M. Hyde, M.D., Ph.D.  Dr. Hyde, who is both a psychiatrist and neurologist, works at the National Institute of Mental Heath in Bethesda, Maryland.  He made the following observations based on his examination of Dr. Nugent:

- Pamela [Nugent] has had persistent right hip pain since the accident.
- The patient complains of cognitive deficits since her accident.
- The patient has had headaches since one week after the accident.
- Two weeks out of every month, she has severe headaches.
- The pain [from her migraines] is constant and pressure-like.  They are disabling.

- The patient was suffering from episodes of speech arrest after the accident.
- Pamela's chronic neck pain is probably due to soft tissue injuries.
- Pamela has had a variety of cognitive complaints related to her accident.
- The patient's headaches sound like post-traumatic migraines.

34.     According to Dr. Hyde, his observations were consistent with the conclusion that the auto accident caused Dr. Nugent persistent health problems, including severe post-concussive syndrome.

35.     Dr. Nugent continued to see Dr. Hyde periodically following this initial evaluation.  To date, she has visited him more than 25 times.

36.     In a letter to Unum dated November 26, 2001, Dr. Nowak stated that "[Dr. Nugent's] symptoms have been of such severity that she has been totally unable to contemplate a return to work as a physician in general or a neuroradiologist in particular."

37.     Two months later Dr. Nowak described Dr. Nugent's clinical symptoms as "problems with attention, concentration, organizational abilities—and migraine-like headaches which themselves exacerbate cognitive impairment."

38.     Dr. Nugent would have greatly preferred to have returned to work in her subspecialty of neuroradiology following her maternity leave.  Because of her debilitating migraine headaches and cognitive deficiencies, however, Dr. Nugent concluded in late 2001 that she could no longer work in the taxing subspecialty of neuroradiology.

39.     Initially, Dr. Nugent was determined to continue employment in some capacity in the medical profession.  In June 2002—19 months after her auto accident—she began working two or three days a week as a gastrointestinal radiologist supervising residents at the Naval Medical Center in Bethesda, Maryland.  That job did not require her to perform the material and substantial duties of a neuroradiologist, nor was it nearly as demanding or as stressful as working in that subspecialty.

40.     After a year at the Naval Medical Center, Dr. Nugent's part-time work evolved into doing pure research in the area of virtual colonoscopy.  She no longer supervised residents, but instead worked largely by herself and had little interaction with her medical colleagues.

41.     At the recommendation of Dr. Hyde, in August 2002, Preston C. Calvert, M.D., a neuro-ophthalmologist, examined Dr. Nugent.  In his report, Dr. Calvert concurred with the opinions of Drs. Nowak, Hyde, Sapin and Green, noting that Dr. Nugent was suffering from "[p]rolonged post-concussive syndrome, complicated by underlying depression" and "multiple visual and cranial manifestations of migraine disorder."

42.     On October 26, 2002, Dr. Hyde reported that Dr. Nugent's headaches continued to be a problem and that her headaches were accompanied by "intense photophobia and sensitivity to loud noises."

43.     On January 10, 2003, Dr. Hyde reported that Dr. Nugent's migraine headaches had grown markedly worse, which he attributed to work-related stress.  He reported that the headaches were sometimes associated with vertigo.  By this time, Dr. Nugent had increased her workload at the Naval Medical Center to four days per week.  Dr. Hyde concluded that Dr. Nugent needed to decrease her stress level by reducing her workload back to two or three days per week.

44.     On May 31, 2003, Dr. Hyde reported that Dr. Nugent continued to experience severe headaches for two weeks out of every month and that these headaches were exacerbated by her work at the Naval Medical Center.

45.     On January 17, 2004, Dr. Hyde reported that Dr. Nugent was experiencing increased stress at her job at the Naval Medical Center, which greatly exacerbated her migraine headaches, and that during those headaches she exhibited extreme sensitivity to light and loud noise.  Dr. Hyde again suggested a reduction in her workload to alleviate these ailments.

46.     On June 4, 2004, Dr. Hyde reported that Dr. Nugent had been experiencing severe headaches for a week, with extreme irritability.  He concluded that the "recent bout of breakthrough migraines is probably related to high levels of situational stress induced in part by her experiences at [The Naval Medical Center]."

47.     On June 1, 2004, Dr. Nugent resigned from her job at the Naval Medical Center because her migraine headaches had became so severe, and her attention deficit so frequent and disorienting, that she believed she had no choice but to leave the medical profession altogether. She subsequently began working part-time for her husband's consulting business, performing routine administrative tasks on an as-needed basis.

48.     On September 2, 2004, Dr. Hyde reported that Dr. Nugent had a severe bout of headaches.  He noted that Dr. Nugent continued to be intensely sensitive to bright lights and loud noises during her headaches.  Dr. Hyde also noted that Dr. Nugent had undergone a gradual improvement after leaving her job at the Naval Medical Center.

49.     On January 31, 2005, Dr. Hyde reported that Dr. Nugent had been experiencing a worsening of her headaches, which had been occurring every day since December 2004.  Her headaches were now accompanied by vertigo, which she had last experienced in the early stages of recovering from her auto accident in November 1999.

50.     In early 2005, at the recommendation of Dr. Hyde, Dr. Nugent was evaluated by H. Jeffrey Kim, M.D., a neurologist at Georgetown University Hospital specializing in the treatment of vertigo.  Dr. Kim opined that Dr. Nugent's vertigo resulted from "accident/migraines which caused a dissociation of ocular from vestibular input to regulatory centers in [the] brain."

51.     On March 4, 2006, Dr. Hyde reported that Dr. Nugent had experienced a major relapse, including a recurrence of severe headaches.  Some of her headaches were severe enough

12

to cause her to remain in bed for the entire day.  Dr. Hyde encouraged Dr. Nugent to undergo a series of botulinum toxin injections for her condition.

52.     In December 2006, Dr. Hyde reported that Dr. Nugent "has difficulty staying on task and completing tasks in a timely fashion.  She is unfocused and daydreams a lot.  She is not productive."

53.     On September 7, 2007, Dr. Hyde reported that Dr. Nugent "has been suffering from a major recurrence in her chronic headache" and that she "has been more disorganized and scattered recently."

54.     On March 6, 2008, Dr. Nugent consulted with Jason Rosenberg, M.D. at the Johns Hopkins Bayview Medical Center in Baltimore, Maryland.  Dr. Rosenberg specializes in the treatment of migraine headaches.  He reported that Dr. Nugent's headaches were still very frequent and that "in addition to severe headaches, she had a number of other possible post concussive symptoms including difficulty reading, poor concentration, and cognitive issues."

55.     On July 14, 16 and 17, 2008, Dr. Nugent was evaluated by James M. Sydnor-Greenberg, Ph.D., a neuropsychologist practicing in Chevy Chase, Maryland.

56.     After administering a series of cognitive tests, Dr. Sydnor-Greenberg diagnosed Dr. Nugent as suffering from persistent post-concussive syndrome that caused the following cognitive weaknesses and symptoms:

- Short-term concentration weakness
- Memory weakness
- Executive skills weakness
- Word retrieval weakness
- Excessive mental fatigue
- Migraine headaches.

Unum's Handling of Dr. Nugent's Disability Claim

57.     On January 31, 2001, Dr. Nugent spoke by telephone to Unum representative Mary Hall.  This was the first time Dr. Nugent contacted Unum regarding her disability.  Dr.

Nugent advised Ms. Hall that she had suffered a head injury from the November 1999 auto accident and that the symptoms of that injury were ongoing and severe, and prevented her from returning to work as a neuroradiologist.

58.     On April 9, 2001, Dr. Nugent telephoned Unum to determine if there was a filing deadline for her notice of claim.  She was advised that there was no such deadline.

59.     Having heard nothing more from Unum, on November 14, 2001, Dr. Nugent again telephoned Unum's Mary Hall, who informed her for the first time that individual disability claims were being handled out of Unum's Worcester, Massachusetts office, and that she needed to contact that office directly.

60.     On January 22, 2002, Dr. Nugent spoke with Unum's Carol McCue, who had been assigned to handle Dr. Nugent's claim.  Ms. McCue misleadingly told Dr. Nugent that her Policy was an "any occupation" policy, meaning Dr. Nugent would not be considered totally disabled if she was capable of working in *any* occupation, not merely in her subspecialty of neuroradiology.  Ms. McCue's statement grossly mischaracterized the coverage provided by the Unum Policy.

61.     On January 25, 2002, Ms. McCue sent Dr. Nugent Unum's first written response to her disability claim.  In that letter, Ms. McCue advised that Unum "will make every effort to reach a determination on your claim as soon as practical."

62.     Seven months later, on August 26, 2002, Ms. McCue advised Dr. Nugent that Unum would be scheduling her for an Independent Medical Exam ("IME") by a Unum-designated doctor.

63.     On September 9, 2002, Ms. McCue told Dr. Nugent that an IME was scheduled for September 28, 2002 with Dr. Sidney Binks.

64.     On September 18, 2002, Cara Bernard replaced Ms. McCue as the Unum representative handling Dr. Nugent's claim.

65.     On September 19, 2002, Dr. Nugent called Ms. Bernard to say that she had returned to work part time as a research radiologist at the Naval Medical Center.  Ms. Bernard told her that in light of that development the scheduled IME would be cancelled.

66.     In a letter dated February 5, 2003, Ms. Bernard advised Dr. Nugent that Unum would be sending a "field representative" to meet with her to discuss her claim.

67.     On May 6, 2003, Dr. Nugent met with Don LeFevre, Unum's field representative, and provided him additional details about her physical impairments and work limitations.  Mr. LeFevre, who on information and belief had no medical training at the time, is the only Unum representative to have ever met Dr. Nugent in person.

68.     In a letter to Dr. Nugent dated June 12, 2003, Cara Bernard summarized Unum's understanding of the history of Dr. Nugent's occupation and impairments and requested a copy of her former and current job descriptions.

69.     On July 29, 2003, Dr. Nugent responded to Ms. Bernard's June 12, 2003 letter, noting that her current duties at the Naval Medical Center involved tasks that were significantly less stressful and demanding, both mentally and physically, than her prior work as a neuroradiologist.

70.     By letter dated September 23, 2003, Ms. Bernard advised Dr. Nugent that Unum would pay her $58,361 in benefits covering the period November 30, 2002 through December 1, 2003—although Dr. Nugent had always maintained that her disability began days after the automobile accident in November 1999.  Ms. Bernard's only explanation of the basis for this payment was that Unum had cancelled the IME.  She advised Dr. Nugent that Unum was continuing to investigate her claim under a reservation of rights.

71.    In December 2003, Dr. Nugent retained an attorney to represent her in pursuit of her disability claim.

Unum's Claim Reassessment Process

72.    As noted by the Second Circuit Court of Appeals in *McCauley v. First Unum Life Insurance Company*, 551 F.3d 126, 137 (2d Cir. 2008):

> First Unum [a Unum Group subsidiary] is no stranger to the courts, where its conduct has drawn biting criticism from judges.  A district court in Massachusetts wrote that "an examination of cases involving First Unum …reveals a disturbing pattern of erroneous and arbitrary benefits denials, bad faith contract misinterpretations, and other unscrupulous tactics." [citation omitted].  That court listed more than thirty cases in which First Unum's denials were found to be unlawful, including one decision in which First Unum's behavior was "culpably abusive." [citation omitted].  Also, First Unum's unscrupulous tactics have been the subject of news pieces on "60 Minutes" and "Dateline," that included harsh words for the company.

73.    The abusive claims handling practices of UnumProvident and its subsidiaries, including Unum and First Unum, are addressed in considerable detail by the federal district court in *Merrick v. Paul Revere Life Insurance Co*., 594 F.Supp.2d 1168 (D. Nev. 2008).  In that case, the district court found that those practices were sufficiently reprehensible to warrant punitive damages under Nevada law at the highest levels constitutionally permissible.  The court detailed how these insurers, including Unum, intentionally engaged in misconduct towards thousands of insureds for their own financial gain, deliberately targeted those who were physically, mentally, emotionally, and financially vulnerable, repeatedly subjected insureds to their bad practices and acted maliciously with trickery and deceit.  The district court's observations regarding Unum's claims-handling practices are incorporated herein by reference.

74.    The widespread abuse of disability claimants by UnumProvident companies, including Unum, led to a four-year multi-state investigation of those companies' claim-handling procedures.   This investigation produced a "Market Conduct Examination Report," which was highly critical of the way Unum managed the claims of its insureds.  Subsequently,

UnumProvident and its subsidiaries, including Unum, entered into a "Regulatory Settlement Agreement" with the United States Department of Labor and 48 states.  The settlement agreement required UnumProvident to pay a $15 million fine and created a Claim Reassessment Process to allow policyholders whose claims were denied after January 1, 1997 to resubmit their claims for reconsideration.

75.     The Market Conduct Examination Report, dated November 18, 2004, identified four major categories of abuse in the way Unum handled long-term disability claims:  (1) excessive reliance on in-house medical professionals; (2) unfair construction of attending physician or IME reports; (3) failure to evaluate the totality of the claimant's medical condition; and (4) placing unfair and inappropriate burdens on claimants to justify their eligibility for benefits.

76.     By letter dated January 21, 2005, Unum advised Dr. Nugent that she had the right to participate in the Claim Reassessment Process.  This announcement came as a surprise to Dr. Nugent, who was under the impression, based on Ms. Bernard's September 23, 2003 letter and subsequent correspondence, that Unum was continuing to evaluate Dr. Nugent's claim.

77.     Based on Unum's January 21, 2005 letter, Dr. Nugent submitted a formal request to participate in Unum's Claim Reassessment Process.  Unum subsequently acknowledged in writing Dr. Nugent's decision to participate in that process.

78.     By letter dated April 15, 2005, Unum's Cara Bernard wrote to Dr. Nugent's attorney reiterating Unum's position that it needed additional information in support of Dr. Nugent's disability claim.  Ms. Bernard was obviously unaware that Dr. Nugent had elected to participate in Unum's Claim Reassessment Process.

79.     By letter dated March 28, 2006—over a year after Dr. Nugent elected to enter Unum's Claim Reassessment Process—Unum's reassessment unit informed her that it was

prepared to reconsider her claim.  Unum's letter stated that Dr. Nugent's claim had been "closed or terminated on 09/26/2003."  This was the first time Unum informed Dr. Nugent that her claim had been closed or terminated.

80.     On July 10, 2007—two years and three months after Dr. Nugent had elected to participate in the Claim Reassessment Process—David Eggleston, in Unum's reassessment unit, telephoned Dr. Nugent's attorney to advise that he was sending a letter documenting the "problems" with Dr. Nugent's claim.  Mr. Eggleston's key point was that Dr. Nugent had not provided Unum with sufficient "objective raw data" to support her assertion that she was no longer capable of practicing her subspecialty.

81.     By letter to Dr. Nugent's attorney dated July 11, 2007, Mr. Eggleston advised that Unum had completed its review of Dr. Nugent's original claim file.  Mr. Eggleston stated that the purpose of his letter was to "document our understandings and highlight our concerns" before Unum completed its reassessment of Dr. Nugent's claim.

82.     By letter dated September 18, 2007, Mr. Eggleston complained that Unum had not received the additional information he had requested, even though Dr. Nugent had already provided Unum with an enormous amount of information in support of her claim.  Mr. Eggleston stated that Unum would simply make its decision "with the information presently available" unless he received the requested information immediately.

83.     By letter dated October 8, 2007, Unum's Diane Henley advised Dr. Nugent that she had replaced David Eggleston as the Unum representative handling her claim.  Thus, Ms. Henley became the fifth Unum representative assigned to Dr. Nugent's claim in a five-year period.

84.     By letter dated November 26, 2007, Unum's Lee Hamilton informed Dr. Nugent of Unum's Reassessment Decision.  According to Mr. Hamilton, Unum determined that its

original decision to deny Dr. Nugent's disability claim was incorrect and that Unum would pay

Dr. Nugent's disability benefits for a "closed period of time" through June 2002.  In other words,

in the course of its reassessment of Dr. Nugent's claim, Unum reached a completely different

coverage position.  Unum now agreed that Dr. Nugent had become totally disabled following the

1999 automobile accident—a conclusion Unum had refused to acknowledge for eight years

following the accident.  Mr. Hamilton advised, however, that Unum also concluded that Dr.

Nugent's disability came to an end at the time she returned to work as a part-time radiologist at

the Naval Medical Center in June 2002.

85.     Unum's Reassessment Decision gave no reason for Unum's reversal of its long-

held position that the auto accident had *not* caused Dr. Nugent's disability.  Nor did Unum's

decision address Dr. Nugent's claim that following the accident she was incapable of working in

her subspecialty of neuroradiology.  Unum's Reassessment Decision did not even address Dr.

Nugent's contention that her return to work on a part-time basis at the Naval Medical Center did

not involve working as a neuroradiologist.

86.     In a letter dated January 6, 2009, Dr. Nugent advised Unum of the many errors

and omissions in its Reassessment Decision.  She also summarized the results of her visits to

health care professionals subsequent to that decision—results that confirmed her continuing total

disability.  Dr. Nugent urged Unum to reconsider its conclusion that her disability had come to

an end in June 2002.

87.     By letter dated January 1, 2009, Unum's Thomas Diebold advised Dr. Nugent that

"no-additional review of the claim reassessment decision will be made at this time."

88.     As set out below, Unum's reassessment of Dr. Nugent's claim was characterized

by the same shortcomings noted in the Market Conduct Examination Report, including:  (1)

excessive reliance on in-house professionals; (2) unfair construction of attending physician

reports; (3) failure to evaluate the totality of Dr. Nugent's medical condition; and (4) placing an all-but-insurmountable burden on Dr. Nugent to justify her eligibility for benefits.

*Unum's excessive reliance on in-house professionals*

89.     Unum never required Dr. Nugent to undergo an IME.  As Unum's Reassessment Decision acknowledges, Unum cancelled the IME it had scheduled for September 28, 2002. Unum did so even though only a month earlier it had advised Dr. Nugent of the need for such an independent examination.

90.     Unum cancelled the IME after being informed by Dr. Nugent that she had begun working at the Naval Medical Center as a part-time research radiologist.  In other words, rather than have Dr. Nugent examined by a qualified physician, Unum simply jumped to the conclusion that her return to work part-time at the Naval Medical Center, in a low-stress research-oriented position, demonstrated her capacity to return to work full-time in her subspecialty of neuroradiology.   There is no support whatsoever for that conclusion.

91.     Fifteen months after Dr. Nugent began working part-time at the Naval Medical Center, Unum advised her that it would be scheduling an IME to include "neuropsychological testing."  Without explanation, Unum never scheduled that examination.  Unum took the same hands-off approach in its Claims Reassessment Process.  Rather than schedule an IME as part of that reassessment—which it had full authority to do—Unum simply had its in-house neurologist engage in a desk-top evaluation.  That "paper assessment" consisted primarily of second-guessing the evaluations of the many health care professionals who had examined Dr. Nugent.

92.     Unum's Reassessment Decision concluded that Dr. Nugent "would have been able to resume working as a neurologist in June of 2002."  Unum reached this conclusion without making any attempt to see or speak with Dr. Nugent or any of her health care providers.

In other words, Unum did not just "excessively rely on its in-house professional," it *exclusively* relied on that professional.

> *Unum's unfair construction of attending physician reports*

93.     Like its initial assessment, Unum's reassessment of Dr. Nugent's claim was an exercise in the selective—and often highly misleading—use of statements lifted from the reports of the health-care specialists who had examined her.

94.     Like its initial assessment, Unum's Reassessment Decision gave virtually no credence to the expert opinions of Drs. Judith Nowak, Thomas Hyde, Jody Green, David Fishkin, or Linda Sapin.  For example, according to the Reassessment Decision, Dr. Nugent "never had any restrictions or limitations due to any diagnosable neurological condition."  This self-serving statement is starkly at odds with the reports of Dr. Nugent's health care specialists and is inconsistent with the conclusion elsewhere in Unum's Reassessment Decision that Dr. Nugent had become totally disabled following her November 1999 auto accident.  Unum made no effort to explain this inconsistency.

95.     Unum's Reassessment Decision states that "it is quite unlikely that this claimant has any cognitive deficits on the basis of the motor vehicle accident."  This opinion totally ignores the observations of Dr. Nugent's health care providers and directly contradicts Unum's decision to award Dr. Nugent disability benefits from the time of the accident (less the 90-day waiting period) through June 2002.

96.      Unum's Reassessment Decision further states that "no data were provided which demonstrate that [Dr. Nugent's] 'relative weaknesses' would have prevented [her] from functioning as a neuroradiologist."  This is a blatantly misleading statement.  Dr. Nugent provided Unum with ample information demonstrating why she could not function in that

capacity, including dozens of reports and test results from her treating physicians and medical specialists.

*Unum's failure to evaluate the totality of Dr. Nugent's medical condition*

97.     According to Unum's Reassessment Decision, Unum's contract neurologist—who never met or spoke with Dr. Nugent—concluded that her "complaints regarding attention and concentration from the time of her accident in November of 1999 were primarily due to her anxiety and depression." This statement is both misleading and irrelevant. Whether Dr. Nugent's occasional depression was the primary cause of her inability to work as a neuroradiologist, only one of several causes, *or the only cause*, is beside the point. The exclusion in the Unum Policy for disabilities from "psychosis, psychoneurosis, anxiety, depression, or emotional or adjustment disorder" was declared null and void effective November 24, 1992. Consequently, unlike many other Unum policies, Dr. Nugent's policy has no exception for disabilities caused in whole or in part by depression or anxiety.

98.     In focusing on Dr. Nugent's depression and anxiety, Unum failed to evaluate the totality of her conditions and how those conditions impacted her capacity to return to work as a neuroradiologist.

99.     Dr. Nugent's medical records show that in addition to occasional periods of depression, since June 2002 she has suffered debilitating migraine headaches, vertigo, periodic bouts of confusion, and attention deficit disorder. Based on information and belief, Unum never evaluated the totality of these conditions.

*Unum's placing an inappropriate burden on Dr. Nugent to demonstrate her disability*

100.    Unum's Reassessment Decision, like its initial evaluation of Dr. Nugent's claim, placed an insurmountable burden on Dr. Nugent to demonstrate her total disability to Unum's satisfaction.

101.    One highly inappropriate burden placed on Dr. Nugent was Unum's demand that she provide more objective raw data to support her disability claim.  Unum's insistence that Dr. Nugent support her claim with such objective data is inconsistent with the language of the Unum Policy and with the case law interpreting similar policy language.  Although some disability policies specify that an insured must support his or her disability claim with objective evidence, the Unum Policy has no such requirement.

102.    It is illogical and highly improper for Unum to insist that Dr. Nugent produce objective raw data to show a health condition that is characterized primarily by *subjective* symptoms.  The symptoms of post-concussive syndrome often cannot be directly observed and measured by objective evidence, such as abnormal EEGs, MRIs and CTs.  Rather, this condition is usually characterized by *subjective* symptoms such as intense migraine headaches, vertigo, periodic bouts of confusion, and attention deficit disorders—the very symptoms displayed by Dr. Nugent.

103.    Numerous courts have held that where the insured has subjective symptoms like those of Dr. Nugent, objective evidence is not the only means of documenting the insured's inability to work in her regular occupation.  This is especially true where, as here, highly-credible evidence offered by the insured has not been contradicted by evidence offered by the insurer.  To date, Unum has not provided any credible evidence contradicting Dr. Nugent's health claims or refuting the extent to which she suffers from post-concussive syndrome.

Unum's Mismanagement of Dr. Nugent's Claim

104.    Unum's handling of Dr. Nugent's disability claim has been characterized by abusive and humiliating treatment of Dr. Nugent, excessive delay, misrepresentations of the applicable law and policy language, and downright incompetence.

105.     It has now been over eight years since Dr. Nugent first notified Unum of her disability claim.  Since then she has suffered debilitating migraines and other health problems that have prevented her from returning to the profession for which she trained intensely for over 10 years.

106.     Instead of paying Dr. Nugent the just compensation that she contracted and paid for, Unum has dragged her through one humiliating experience after another—frequently questioning her veracity, failing to return her phone calls for weeks or months at a time, harassing her with repeated requests for information that she had previously provided, giving her misleading and inconsistent information about the extent of the coverage provided by the Unum Policy, repeatedly replacing the Unum representative handling her claim, refusing to explain the bases of its partial benefit payments, and taking years to reach a final coverage decision.  These same abuses continued during Unum's Claim Reassessment Process.

107.     Underscoring the arbitrary way that Unum has handled Dr. Nugent's claim are Unum's inconsistent and confusing positions with respect to her period(s) of disability.  Only after she had retained an attorney to help her pursue coverage—and a full two and one-half years after she first submitted her claim—Unum awarded her partial benefits for the 12-month period from November 30, 2002 to December 1, 2003.  Unum described this payment as one for a "Total Disability" that lasted from September 1, 2002 through December 1, 2003.  Unum never fully explained how it arrived at this decision, which is inconsistent with the conclusion in Unum's Reassessment Decision that Dr. Nugent's disability came to an end when she returned to work part-time in June 2002.  Unum's Reassessment Decision does not even mention this inconsistency.

108.    Based on information and belief, Unum offered this partial payment to Dr. Nugent in an attempt to "buy her off," hoping she would simply go away and abandon her disability claim.

109.    Equally confusing is Unum's conclusion in its Reassessment Decision that Dr. Nugent was entitled to benefits for the period March 21, 2000 through June 1, 2002—even though Unum previously insisted that Dr. Nugent was not disabled during that period.

110.    Unum's Reassessment Decision states that Unum's initial determination to deny Dr. Nugent's claim was "incorrect," but fails to explain why.   Nor does that decision explain why Unum now believes the benefit period began on March 21, 2000.  Apparently, Unum now concedes—after years of denying it—that the November 1999 auto accident did indeed result in Dr. Nugent's disability.  The Reassessment Decision gives no explanation of why Unum took so long to arrive at this conclusion.

111.    By letter dated January 21, 2005, Unum advised Dr. Nugent that her claim was eligible for reassessment under the Regulatory Settlement Agreement.  This letter led Dr. Nugent to believe that Unum had previously denied her claim, although Unum had never advised Dr. Nugent of that fact.  Accordingly, on March 9, 2005, Dr. Nugent submitted a request to participate in the Claim Reassessment Process.  Five weeks later, Unum's Cara Bernard advised Dr. Nugent that Unum was continuing to evaluate her claim.  Ms. Bernard made no mention of Unum's January 21, 2005 letter inviting Dr. Nugent to participate in the Claims Reassessment Process.  On information and belief, Ms. Bernard was not even aware of that invitation, much less that Dr. Nugent had accepted it.

112.    On numerous occasions, Unum misrepresented to Dr. Nugent the applicable coverage provisions in her Policy.  For example, the Unum Policy provides "own occupation" as opposed to an "any occupation" disability coverage.  That is, Dr. Nugent must be considered

totally disabled if she cannot engage in her own occupation as a neuroradiologist, regardless of whether she is capable of working in any other occupation.  On January 22, 2002, however, Unum's Carol McCue telephoned Dr. Nugent and read her the policy definition of "any occupation."  According to Ms. McCue, under that definition Dr. Nugent was not totally disabled as long as she was physically able to work at *any* job.  This is a blatantly misleading description of the coverage provided by the Unum Policy.  On information and belief, Unum made this misrepresentation to convince Dr. Nugent to abandon her claim.

113.    Unum initially advised Dr. Nugent that she did not qualify for disability benefits because she was on maternity leave at the time of her November 1999 auto accident rather than working in her subspecialty of neuroradiology.  This assertion was inconsistent with well-settled case law addressing similar "leave of absence" cases.

114.    Unum has insisted that Dr. Nugent support her disability claim with objective evidence, even though there is no such requirement in the Unum Policy and despite the fact that courts have uniformly rejected this argument in other disability cases.

115.    Unum's interpretation of the definition of "total disability" in the Unum Policy does not square with cases interpreting that same definition.  According to Unum, to be totally disabled Dr. Nugent must show that she is unable to perform *each and every* material duty of a neuroradiologist.  This is incorrect.  Under the definition of "total disability" in the Unum Policy, Dr. Nugent must only show that she cannot perform *any one or more* of those duties.

## COUNT I
(Breach of Contract)

116.    The allegations in Paragraphs 1 through 115 are realleged as if fully set forth herein.

117.    Dr. Nugent has fulfilled her obligations under the Unum Policy and has satisfied all conditions precedent.

118.     Unum has a contractual duty to pay Dr. Nugent all disability benefits, plus interest, that have accrued over the period of her total disability from June 1, 2002 until the present.  Unum has breached its contractual obligation to Dr. Nugent by failing to pay her all but a small fraction of the benefits to which she is entitled.

119.     As a direct and proximate result of its contractual breach, Unum has deprived Dr. Nugent of the disability benefits to which she is entitled and for which she timely paid all required premiums.

120.     As a direct and proximate result of Unum's contractual breach, Dr. Nugent has felt compelled to continue making premium payments during the period of her total disability to assure that Unum does not cancel her Policy.  She is entitled to the return of all such premium payments, with interest.

121.     On information and belief, Dr. Nugent's unpaid benefits, unreimbursed premium payments, and accrued interest on those sums total at least one million dollars ($1,000,000).

### COUNT II
(Unum's Breach of the Implied Covenant of Good Faith and Fair Dealing)

122.     The allegations in Paragraphs 1 through 121 are realleged as if fully set forth herein.

123.     Parties to every commercial contract, including insurance contracts, owe each other a duty of good faith and fair dealing.  Accordingly, Unum agreed to act in good faith and deal fairly with Dr. Nugent when it entered into the insurance contract and accepted her premium payments.

124.     Unum's conduct in handling Dr. Nugent's claim—including without limitation the conduct set out above—constitutes extreme and outrageous behavior by Unum that denied Dr. Nugent the fruits of her insurance contract, in violation of the implied covenant of good faith and fair dealing inherent in that contract.

125.     As a direct and proximate result of Unum's violation of its implied covenant of good faith and fair dealing, Dr. Nugent has been deprived of the bargained-for value of her insurance contract.

126.     Because Dr. Nugent has at all times complied with the terms of the Unum Policy, and in light of Unum's breach of its duty of good faith and fair dealing, Dr. Nugent is entitled to an award that will compensate her for all damages legally caused by that breach, including her past and future contract benefits, an amount that will compensate her for her emotional distress, and an amount that will compensate her for her economic losses, including loss of the value of time, interest expense, attorney's fees, and other losses she sustained as a result of the breach.

127.     With respect to future benefits, it would be unreasonable to require Dr. Nugent to continue to subject herself to the same illegitimate process of applying to Unum for those benefits.  Accordingly, Dr. Nugent is entitled to an immediate payment of the present value of her anticipated future disability benefits under the Unum Policy from and after the date on which judgment is entered.

## COUNT III
(Declaratory Relief)

128.     The allegations in Paragraphs 1 through 127 are realleged as if fully set forth herein.

129.     Under the Unum Policy, Unum is obligated to pay Dr. Nugent disability benefits due in the future during the period of Dr. Nugent's continuing total disability.

130.     Because Unum has not acknowledged its coverage obligations with respect to Dr. Nugent's total and continuing disability, there exists an actual controversy between Dr. Nugent and Unum, entitling Dr. Nugent to a declaration of rights and further relief pursuant to 28 U.S.C. § 2201.  Such a declaration would be an alternative to the relief requested in Count II above.

131.    A declaration of rights pursuant to 28 U.S.C. § 2201 would help alleviate much of the uncertainty facing Dr. Nugent with respect to whether she will receive future disability benefits during her continuing total disability.

## COUNT IV
(Unum's Intentional Infliction of Emotional Distress)

132.    The allegations in Paragraphs 1 through 131 are realleged as if fully set forth herein.

133.    Unum's  conduct in handling Dr. Nugent's claim—including, without limitation, Unum's repeated accusations that Dr. Nugent was exaggerating the extent of her physical ailments, Unum's misleading statements to Dr. Nugent regarding the scope of her coverage, Unum's failure to advise Dr. Nugent until March 28, 2006 that her claim had been "closed and terminated" two and one-half years earlier, Unum's scheduling and cancelling of an  independent medical evaluation, Unum's assigning five separate claims representatives over a five-year period to handle Dr. Nugent's claim, Unum's advising Dr. Nugent of her right to participate in the Claim Reassessment Process while at the same time asserting that her claim had not yet been denied, and Unum's disparagement of Dr. Nugent's motives and veracity—all constitute extreme and outrageous conduct by Unum.

134.    Unum was well aware, having frequently corresponded with Dr. Nugent regarding her disability claim and the state of her physical and mental well-being, that stress greatly exacerbated her symptoms of post-concussive syndrome, particularly her migraine headaches and depression, causing her severe emotional distress and mental anguish.  Accordingly, by its conduct—including without limitation the conduct summarized in the preceding paragraph—Unum recklessly caused Dr. Nugent to suffer severe emotional distress and mental anguish, with the full knowledge that Dr. Nugent was peculiarly susceptible to such conditions.

135.    Unum's extreme and outrageous conduct in the handling of Dr. Nugent's disability claim caused Dr. Nugent to suffer severe emotional distress, and has exacerbated the symptoms of her total disability, including mental anguish, frustration, depression, anxiety, stress, and cognitive impairment, for which she seeks two million dollars ($2,000,000) in compensatory damages.

## COUNT V
(Punitive Damages for Unum's Willful and Reckless Disregard
of Dr. Nugent's Rights)

136.    The allegations in Paragraphs 1 through 135 are realleged as if fully set forth herein.

137.    Unum's reassessment of Dr. Nugent's claim was characterized by the same type of misconduct that, according to the Market Conduct Examination Report, characterized Unum's handling of its other insureds' disability claims prior to the issuance of that report.  This misconduct included:  (1) excessive reliance on in-house professionals; (2) unfair construction of attending physician reports; (3) failure to evaluate the totality of the insured's medical condition; and (4) inappropriate burden placed on insureds to justify their eligibility for benefits.  Moreover, in evaluating Dr. Nugent's claim, Unum used biased examiners, ignored the definition of "total disability" in the Unum Policy, misinformed or failed to inform Dr. Nugent about the benefits provided by the Policy, and knowingly engaged in other practices that fell well below industry standards.

138.    Dr. Nugent believed that Unum would evaluate her claim as part of the Claim Reassessment Process in a fair and reasonable manner, with none of the abusive conduct that had characterized Unum's pre-reassessment claims handling.  Largely for this reason, Dr. Nugent elected to participate in the reassessment process, even though she realized that doing so would substantially delay the resolution of her claim.

139.    Unum's reassessment of Dr. Nugent's claim constitutes malicious, oppressive, willful and wanton disregard of Dr. Nugent's rights under the Unum Policy and under the agreed-upon Claim Reassessment Process.

140.    Unum's conduct when reassessing Dr. Nugent's claim and in denying that she was totally disabled after June 2002—notwithstanding the overwhelming evidence to the contrary—merged with and assumed the character of the tort of intentional infliction of emotional distress.

141.    Unum's conduct in reassessing Dr. Nugent's claim was part of Unum's ordinary business practices designed to avoid paying disability benefits that were legitimately owed to Dr. Nugent in order to increase Unum's profits.  In the course of that reassessment, Unum acted willfully, recklessly, oppressively and in conscious disregard of Dr. Nugent's rights under the Unum Policy.

142.    Its outrageous conduct in reassessing Dr. Nugent's claim subjects Unum to an amount of punitive damages as are necessary to deter such misconduct in the future.  By resorting to the same claims handling conduct that resulted in the Multi-State Market Conduct Examination in the first place, Unum has demonstrated that its claims-handling abuses will not be easily deterred.  Accordingly, Dr. Nugent seeks fifteen million dollars ($15,000,000) in exemplary or punitive damages, which is a small fraction of Unum's current net worth and is the minimum amount sufficient to deter such misconduct in the future.

## COUNT VI
(Unum's Vexatious, Wanton and Oppressive Handling of Dr. Nugent's
Claim Entitling Her to an Award of Attorneys' Fees and Costs)

143.    The allegations in Paragraphs 1 through 142 are realleged as if fully set forth herein.

144.     Unum's totally inadequate investigation of Dr. Nugent's claim during the Claim Reassessment Process, its misleading statements in encouraging her to participate in that process in the first place, its reliance solely on the "desktop" assessment of an in-house neurologist who never even spoke with Dr. Nugent or her treating physicians, its inexplicable refusal to give credence to the reports and opinions of numerous medical experts who did examine Dr. Nugent, its insistence on wrongfully equating the material duties of a neuroradiologist with those of a radiologist (knowing full well there was no support for such an assumption), its lengthy delays in reaching a coverage decision, its refusal to explain to Dr. Nugent the bases of its partial benefit payments (although repeatedly asked by Dr. Nugent to do so), and its constant badgering of Dr. Nugent to provide "objective raw data" even though her ailments were largely subjective in nature, constitute vexatious, wanton and oppressive conduct entitling her to recover from Unum the attorneys' fees and costs she incurs in bringing and prosecuting this lawsuit.

## JURY DEMAND

145.     Dr. Nugent demands a trial by jury of all issues triable by right to a jury.

## PRAYER FOR RELIEF

Wherefore, Dr. Nugent prays that this Court:

A.     Enter judgment against Unum for monetary damages, plus interest, attorneys' fees and costs, for breach of its contractual duty to pay Dr. Nugent disability benefits from June 1, 2002 to the present;

B.     Enter judgment against Unum for the present value of all future benefits to which she is entitled under the Unum Policy, as calculated using applicable actuarial data;

C.     Enter judgment, pursuant to 28 U.S.C. § 2201, declaring that Unum is obligated to pay all future disability benefits to Dr. Nugent over the period of her total disability;

D.      Enter judgment against Unum for $2,000,000 to compensate Dr. Nugent for the emotional distress and mental anguish she has suffered as a result of Unum's reckless misconduct in handling, reassessing and denying her disability claim;

E.      Order Unum to pay $15,000,000 in punitive damages to deter such misconduct in the future;

F.      Award Dr. Nugent her attorneys fees and other expenses incurred and to be incurred in bringing and prosecuting this action;

G.      Award Dr. Nugent her costs other than attorneys' fees, pursuant to Fed. R. Civ. P. 54(d)(1); and

H.      Grant such other relief as the Court deems just and proper.

Respectfully submitted,

Thomas K. Bick (DC Bar No.938944)
Richard Gordin (DC Bar No. 925727)
Efe Poturoglu (DC Bar No. 486116)
BUTZEL LONG TIGHE PATTON, PLLC
1747 Pennsylvania Ave., NW - Suite 300
Washington, D.C. 20006
Tel:  (202) 454-2800
Fax:  (202) 454-2805